THE STATE OF OHIO, APPELLEE, *v.* YARBROUGH, APPELLANT.

[Cite as *State v. Yarbrough,* 104 Ohio St.3d 1, 2004-Ohio-6087.]

(No. 2000–2119—Submitted April 13, 2004—Decided December 1, 2004.)

MOYER, C.J.

{¶ 1} This is a regrettable case in which the attorneys involved—the prosecutor, defense counsel, and even the trial judge—failed to exercise the level of assiduity we expect of participants in the criminal prosecution of a capital case. The General Assembly has not authorized an Ohio court of common pleas to exercise jurisdiction over the prosecution of a defendant for the crime of aggravated murder when, as here, the killing occurred in another state. As a result, it is our duty to reverse the convictions of aggravated murder and vacate the death sentences imposed on defendant-appellant, Terrell Yarbrough. We do, however, affirm multiple other convictions, including convictions for robbery, burglary, and kidnapping, and a total prison sentence of 59 years for those crimes.

{¶ 2} Moreover, we note that Yarbrough may yet be tried in an appropriate court for crimes relating to the deaths of the men he victimized. We are not aware of any precedent that would prevent Pennsylvania, whose law also provides for the death penalty, from trying appellant for the abhorrent murders of the two college students. See *Heath v. Alabama* (1985), 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387; 18 Pa.Consol.Stat.Ann. 112(1) and 1102.

{¶ 3} The genesis of the error that mandates this reversal appears to be the prosecutor's failure to distinguish between the venue statute and the jurisdiction statute in drafting the indictment. Incorrectly relying on the language of the venue statute, both the state and the defense proceeded—indeed, through the appeal to this court—under the assumption that Ohio courts had subject-matter jurisdiction to try Yarbrough for aggravated murder when the homicides did not occur in Ohio, but in Pennsylvania. The Ohio *jurisdiction* statute, however—because of the limited manner in which the General Assembly has drafted it—simply does not provide jurisdiction over homicides that occur outside the borders of Ohio. See R.C. 2901.11.

{¶ 4} Nothing in the record reflects that the defense counsel or the trial court ever recognized this error—despite the fact that the prosecutor was seeking the

death penalty. It was not until our review of the record and our request for supplemental briefing that the issue of the jurisdiction of the trial court over the aggravated-murder charges was addressed. See *State v. Lomax,* 96 Ohio St.3d 318, 2002-Ohio-4453, 774 N.E.2d 249, ¶ 17 (subject-matter jurisdiction cannot be waived and may be raised by this court, sua sponte, on appeal). One would expect that those charged with the responsibility of participating in the prosecution of a defendant who is subject to the ultimate penalty would exercise more diligence. In failing to observe the General Assembly's statutory rules of jurisdiction, these attorneys disserved the citizens of Ohio and, in particular, the victims of these abhorrent crimes.

{¶ 5} Despite the time that has passed since the homicides were committed in Pennsylvania, despite overwhelming evidence that the defendant participated in the murders, and despite the anguish suffered by the family and friends of the victims, it is our responsibility as members of this court to preserve the integrity of the criminal-justice system in Ohio. To that end, our decision follows.

### *State's case*

{¶ 6} Aaron Land, age 20, Brian Muha, age 18, and Andrew Doran were college students living in a street-level apartment at 165 McDowell Avenue in Steubenville. On May 30, 1999, Muha parked his mother's Chevrolet Blazer outside the apartment. During the early morning hours of May 31, 1999, Land and Doran were asleep in their bedrooms, and Muha was asleep on the living room couch.

{¶ 7} Around 5:00 a.m. on May 31, Yarbrough and Nathan Herring broke into the house and woke up Land and Muha by repeatedly hitting them with a pistol. Yarbrough and Herring then demanded the keys to the Blazer, and Muha gave them the keys.

{¶ 8} Doran, awakened by the noise of "a loud series of crashes," crawled out a window and reentered the house by a side door. Doran then saw a black male with a white handkerchief over his mouth and a hood pulled over his head, who looked at Doran and said, "Oh, f* * *, we have another one here." Doran then ran to a nearby residence and called the police.

{¶ 9} Yarbrough and Herring forced Land and Muha out of the house and into the back seat of the Blazer and drove towards Pittsburgh. During the trip, Yarbrough forced Land and Muha to engage in oral sex.

{¶ 10} In Washington County, Pennsylvania (near Pittsburgh), Yarbrough and Herring stopped the Blazer on the highway berm. Yarbrough forced the victims out of the car and into a forested area and separately shot them in the head with a .44–caliber handgun. The bodies appeared to have been placed under a bush in an area of thick vegetation. Yarbrough and Herring then took Muha's automatic-

teller-machine ("ATM") card and some cash, walked back to the Blazer, and drove to Pittsburgh.

{¶ 11} Around 6:30 a.m. on May 31, Yarbrough and Herring stopped at an ATM in Pittsburgh and unsuccessfully attempted to withdraw cash using Muha's ATM card.

{¶ 12} During the early afternoon of May 31, Yarbrough and Herring went to the Squirrel Hill section of Pittsburgh to steal a second car. They saw Barbara Vey leave her house and drive away in a green BMW. Vey returned to her third-floor apartment in the house 10 to 15 minutes later.

{¶ 13} As Vey was leaving her apartment again, Yarbrough and Herring attacked her on a stairwell landing. Yarbrough demanded the keys to Vey's car, while Herring pointed a gun at Vey and screamed, "I'm going to kill you." Yarbrough then stood between Herring and Vey and said, "Don't shoot her." After Vey told Yarbrough and Herring that the car keys were in her apartment, they walked up to her apartment, and Vey gave the keys to Yarbrough. Before departing, Yarbrough told Vey, "I saw you earlier and I wanted you to be my girlfriend," and lifted Vey's chin and kissed her. After Yarbrough and Herring left, Vey called the police.

{¶ 14} Later that afternoon, Yarbrough drove the Blazer back to Steubenville, and Herring drove the BMW to Steubenville. En route, Yarbrough ran out of gas. Brian Porter, a passing motorist, stopped and gave him a ride to a nearby gas station. Yarbrough told Porter that he was from Pittsburgh, that he was traveling with another man who was driving a BMW, and that the other driver "just kept going" after Yarbrough ran out of gas.

{¶ 15} After returning to Steubenville, Yarbrough met with a friend, Brandon Young, and they drove around together in the Blazer. Young asked Yarbrough where he had gotten the Blazer, and Yarbrough said that he had "made a lick" (i.e., committed a robbery). Yarbrough told Young that he and Herring had broken into a house and had "started beating on 'em with a gun." Yarbrough said he pushed the two victims into the Blazer and "took them up to the woods or mountains." Yarbrough said he "did two domies" (i.e., two head shots). Yarbrough also said he made the victims perform oral sex on each other before he killed them.

{¶ 16} Steubenville police officers dispatched to 165 McDowell found the house in disarray, with furniture knocked over and blood in the living room, on the bedding, and on the wall in Land's bedroom. There were no signs of forced entry. Steubenville police broadcast the description and license number of the missing Blazer to their colleagues and other law enforcement agencies.

{¶ 17} Around 6:00 p.m. on May 31, Steubenville police officers followed the Blazer into a parking lot. Yarbrough and Young fled the Blazer and ran down the street. After a short chase, Yarbrough was arrested. Around 8:00 p.m. on May 31, the police recovered Vey's BMW in Steubenville.

{¶ 18} Around 7:00 p.m. on May 31, Steubenville detectives interviewed Yarbrough and advised him of his *Miranda* rights, and he waived those rights. During this interview, Yarbrough lied about his identity and his whereabouts on May 31. He denied involvement in the theft of the Blazer or any knowledge about the missing students. Police also seized a religious necklace Yarbrough was wearing, which was later identified as Muha's.

{¶ 19} On the morning of June 2, 1999, the police apprehended and questioned Young and Herring. Later that afternoon, Yarbrough—who was still in custody—informed the police that he wished to speak to them again. Police detectives interviewed Yarbrough around 3:00 p.m. that day. Following advisement and waiver of his *Miranda* rights, Yarbrough admitted his involvement in the theft of the Blazer and the abduction of Land and Muha. However, Yarbrough claimed that Herring and Young had shot and killed the two victims.

{¶ 20} On June 3, police discovered evidence linking the Steubenville and Pittsburgh crimes. On that date, Pennsylvania State Police found an ATM receipt from Muha's account underneath the front seat of Vey's BMW. The receipt showed an attempted transaction from an ATM in Pittsburgh at 6:35 a.m. on May 31, 1999. Police later obtained a videotape showing Yarbrough attempting to use the ATM at around 6:35 a.m. on May 31.

{¶ 21} On the evening of June 3, 1999, Pittsburgh police officers interviewed Yarbrough in Steubenville. Following another advisement and waiver of his *Miranda* rights, Yarbrough again admitted his involvement in the theft of the Blazer and the abduction of Land and Muha. Yarbrough claimed that Young had forced Muha and Land to commit oral sex while they were in the vehicle. Yarbrough then claimed that Herring had ordered the victims out of the Blazer, had forced them to walk up a hill, and had shot both victims in the head.

{¶ 22} During this interview, Yarbrough agreed to show the police the location of the bodies. Although it was getting dark, Yarbrough took the police to a spot along a highway berm in Washington County, Pennsylvania. On June 4, police found the bodies lying in heavy undergrowth, directly uphill from where Yarbrough had taken them. Land's pants were unbuttoned and partially unzipped when the police found his body.

{¶ 23} During a search of the Blazer, police found two .44–caliber bullets in its front console. At trial, an FBI materials-analysis examiner testified that the composition of a lead bullet fragment recovered from Muha's body was analytically indistinguishable from the metallic composition of the .44–caliber cartridges

found in the Blazer. An FBI fingerprint specialist identified Yarbrough's fingerprints on the inside and the exterior of the Blazer.

{¶ 24} An FBI forensic DNA examiner concluded that Yarbrough was the contributor of DNA material obtained from a cigarette butt found in the Blazer's ashtray. The probability of selecting an unrelated individual at random with the same DNA profile was one in 24 billion in the black population. The DNA examiner also found that Land was the source of DNA in three bloodstains on Yarbrough's sweatpants. Additionally, Muha was the possible contributor of DNA from blood found on Yarbrough's socks.

{¶ 25} A forensic pathologist concluded that Muha had died from a single close-range gunshot wound to the right side of his head. Muha's upper and lower jaws were also broken, but not by the gunshot. Land died from a single close-range bullet that entered his head behind his ear. Both victims had been shot by a .40- or .44–caliber gun.

{¶ 26} James Jones Jr., one of Yarbrough's former cellmates at the Jefferson County jail in 1999, testified that Yarbrough told him that he had shot one of the victims in the head and saw "the bullet exit outside his head." Yarbrough also admitted that "[h]e made them do oral sex on the way there." According to Jones, Yarbrough also said that "he was going to say that Boo [Herring] held a gun to his head and forced him to shoot one of them."

{¶ 27} Sean Dudley, another 1999 county-jail cellmate, testified that Yarbrough told him that he had kidnapped the two victims and had "walked them * * * into the forest and he shot both of them." According to Dudley, Yarbrough also said that he "made them suck each other's privates."

{¶ 28} Phillip Thompson, another 1999 cellmate, testified that Yarbrough "joked about kidnapping [the two victims] and * * * looking for a place to take them to Pa[.] and shoot them." Yarbrough "went on to say that * * * he shot * * * both guys * * * with one bullet straight through the head without them saying a word." According to Thompson, Yarbrough also said that Herring threw the murder weapon into the river.

### Defense case

{¶ 29} Dr. Thomas Huard, Ph.D., a DNA analyst for the Speckin Forensic Laboratories in Michigan, reviewed FBI crime-lab results on DNA testing. Dr. Huard verified the presence of Herring's DNA on a variety of evidence, including items from the Blazer, the BMW, and Herring's home. Of 40 pieces of evidence examined, Dr. Huard testified that Herring's DNA was found on 12 to 15 items and that Yarbrough's DNA was found on two items. He also found that Young's DNA did not match any of the evidence.

{¶ 30} Dr. Huard confirmed that Yarbrough's DNA was on a cigarette butt found in the Blazer. Dr. Huard also found no direct evidence that Muha's DNA was on Yarbrough's socks since no usable DNA was obtained from Muha. Instead, DNA samples from Muha's parents were used in testing. Thus, according to Huard, the FBI's finding that Muha's DNA matched the DNA on Yarbrough's socks was a match by inference.

### Trial result

{¶ 31} Yarbrough was charged with 12 counts of aggravated felony-murder, and eight other related felony counts. He pleaded not guilty to all charges. Yarbrough was found guilty of all counts and sentenced to death. The following chart summarizes all counts, specifications, and sentences.

| Counts and Specifications | Verdict | Jury Rec. | Sentence |
|---|---|---|---|
| 1. Agg. Robbery* | Guilty | | 10 years |
| 2. Agg. Burglary* | Guilty | | 10 years |
| 3. Kidnapping (Land)* | Guilty | | 10 years |
| 4. Kidnapping (Muha)* | Guilty | | 10 years |
| 5. Gross Sexual Imposition* | Guilty | | 18 months |
| 6. Agg. Felony-murder of Land (kidnapping) + R.C. 2929.04(A)(7) (kidnapping)* | Guilty | Death | Death (counts 6-8 and 13-15 merged) |
| 7. Agg. Felony-murder of Land (agg. robbery) + (A)(7) (agg. robbery)* | Guilty | Death | |
| 8. Agg. Felony-murder of Land (agg. burglary) + (A)(7) (agg. burglary)* | Guilty | Death | |
| 9. Agg. Felony-murder of Muha (kidnapping) + (A)(7) (kidnapping)* | Guilty | Death | Death (counts 9-11 and 16-18 merged) |
| 10. Agg. Felony-murder of Muha (agg. robbery) + (A)(7) (agg. robbery)* | Guilty | Death | |
| 11. Agg. Felony-murder of Muha (agg. burglary) + (A)(7) (agg. burglary)* | Guilty | Death | |
| 12. Agg. robbery (BMW)* | Guilty | | 10 years |
| 13. Agg. Felony-murder of Land (kidnapping) + (A)(3) (escape appreh.) | Guilty | Death | |
| 14. Agg. Felony-murder of Land (agg. robbery) + (A)(3) (escape appreh.) | Guilty | Death | |
| 15. Agg. Felony-murder of Land (agg. burglary) + (A)(3) (escape appreh.) | Guilty | Death | |
| 16. Agg. Felony-murder of Muha (kidnapping) + (A)(3) (escape appreh.) | Guilty | Death | |
| 17. Agg. Felony-murder of Muha (agg. robbery) + (A)(3) (escape appreh.) | Guilty | Death | |
| 18. Agg. Felony-murder of Muha (agg. burglary) + (A)(3) (escape appreh.)* | Guilty | Death | |
| 19. Receiving stolen property (Chevy Blazer)* | Guilty | | 18 months |

| 20. Grand Theft (Chevy Blazer) | Guilty | 18 months |
|---|---|---|
| * Firearm spec. | Guilty | 12 years |

{¶ 32} Herring was also convicted of the aggravated murder of Land and Muha in the Jefferson County Court of Common Pleas. Herring was sentenced to two life terms in prison without the possibility of parole for their murders. The court of appeals affirmed the judgment of the trial court. *State v. Herring,* Jefferson App. No. 00 JE 37, 2002-Ohio-2786.

{¶ 33} Yarbrough now appeals to this court as a matter of right.

### Jurisdiction

{¶ 34} R.C. 2901.11, Ohio's criminal-law jurisdiction statute reads:

{¶ 35} "(A) A person is subject to criminal prosecution and punishment in this state if any of the following occur:

{¶ 36} "(1) The person commits an offense under the laws of this state, **any element** of which takes place in this state.

{¶ 37} "(2) While in this state, the person conspires or attempts to commit, or is guilty of complicity in the commission of, an offense in another jurisdiction, which offense is an offense under both the laws of this state and the other jurisdiction.

{¶ 38} "* * *

{¶ 39} "(B) **In homicide, the element referred to in division (A)(1) of this section is either the act that causes death, or the physical contact that causes death, or the death itself.** If any part of the body of a homicide victim is found in this state, the death is presumed to have occurred within this state.

{¶ 40} "* * *

{¶ 41} "(D) When an offense is committed under the laws of this state, and it appears beyond a reasonable doubt that the offense or any element of the offense took place either in this state or in another jurisdiction or jurisdictions, but it cannot reasonably be determined in which it took place, the offense or element is conclusively presumed to have taken place in this state for purposes of this section." (Boldface added.)

{¶ 42} It is true that the 1973 Ohio Legislative Service Commission comment attached to R.C. 2901.11 states that the enactment is intended to grant Ohio courts "the broadest possible jurisdiction over crimes and persons committing crimes in or affecting this state, consistent with constitutional limitations." The language of R.C. 2901.11, however, controls.

{¶ 43} Under the "any element" rule in R.C. 2901.11(A)(1), a person may be tried for an offense in Ohio if he or she commits any element of the offense within

Ohio's boundaries. However, R.C. 2901.11(B) narrows the scope of "any element" in homicide cases to "either the act that causes death, or the physical contact that causes death, or the death itself." See, also, 2 Katz & Giannelli Criminal Law (2d Ed.2003), Section 55:4.

{¶ 44} The felony portion of the aggravated murder charges against Yarbrough began with the burglary, robbery, and kidnapping of the victims in Ohio. However, undisputed evidence established that Muha and Land were shot in Washington County, Pennsylvania. Here, the act causing the deaths, the physical contact causing the deaths, and the deaths themselves all occurred in Pennsylvania. Thus, under a plain reading of R.C. 2901.11, particularly R.C. 2901.11(B), Ohio does not have statutory jurisdiction over the homicides of Land and Muha.

{¶ 45} The wording of the indictment and the trial court's instructions refer to Yarbrough's "course of criminal conduct" as the basis for jurisdiction over the aggravated murders in Pennsylvania. However, the General Assembly did not include "course of criminal conduct" in R.C. 2901.11, the jurisdiction statute.

{¶ 46} Apparently, the prosecutor and the trial judge misconstrued the "course of criminal conduct" provisions in R.C. 2901.12(H), the state's venue statute, as applicable to jurisdiction over the homicides. But the state's venue statute provides no basis for asserting jurisdiction over out-of-state murder offenses. R.C. 2901.12(H) provides, "When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred." However, as the Legislative Service Committee comments to R.C. 2901.12 state, "This section *presupposes that the state has jurisdiction to try an offender,* and speaks to the question of where the trial is to take place." (Emphasis added.)

{¶ 47} Each of the murder counts in the indictment improperly sets forth course of criminal conduct as the basis for jurisdiction as follows: "THE JURORS OF THE GRAND JURY of the State of Ohio * * * do find and present that on or about May 31, 1999, at Jefferson County, Ohio, and/or *as part of a course of criminal conduct* in which the offender committed the offense in different jurisdictions, and/or any element of the offense occurred in Jefferson County, Ohio, and/or the offense involved the same victim and/or was committed as part of the same transaction or chain of events or in furtherance of the same purpose or objective, and/or the offense or any element of the offense was committed in a motor vehicle in transit and it cannot reasonably be determined in which jurisdiction the offense was committed, TERRELL YARBROUGH, aka MICHAEL POOLE did, purposely cause the death of another * * *." (Emphasis added.) The indictment did not charge that "the act that cause[d] death, or

the physical contact that cause[d] death, or the death itself" occurred in Ohio as required to invoke jurisdiction under R.C. 2901.11(B). Yet it is these facts upon which the exercise of jurisdiction over homicide charges depends.

{¶ 48} Challenges to statutory jurisdiction under R.C. 2901.11 have been raised in other interstate murder cases. In *State v. Rydbom* (Apr. 14, 1998), Washington App. No. 97CA16, 1998 WL 177541, murder charges were dismissed for lack of jurisdiction under R.C. 2901.11 where the facts established that the victim was murdered in West Virginia and the body was moved to Ohio.

{¶ 49} In contrast, Ohio jurisdiction has been upheld under R.C. 2901.11(D) in several cases in which the murder victim was found out of state, and there was evidence that the murder occurred in Ohio or the location of the murder could not be determined. See *State v. Hubbard* (Feb. 5, 2001), Butler App. No. CA99–12–222, 2001 WL 121122 (defendant killed girlfriend in Ohio and moved body to Tennessee); *State v. Phelps* (Sept. 19, 1996), Cuyahoga App. No. 69157, 1996 WL 532092 (blow causing death occurred in Ohio and the body was found in Pennsylvania); *State v. Boyle* (Sept. 26, 1991), Richland App. No. CA–2784, 1991 WL 208063 (wife murdered at Ohio residence and her remains found in Pennsylvania). Unlike in those cases, the evidence in this case unmistakably shows that Land and Muha were not shot and killed in Ohio.

{¶ 50} Other states have enacted legislation that provides a more expansive basis for trying out-of-state murders. Specific provisions of these state's jurisdictional statutes permit jurisdiction over murders committed under circumstances similar to those here.[1] But in Ohio, the General Assembly has not conferred jurisdiction over homicides that occur outside of Ohio. See R.C. 2901.11(B).

{¶ 51} Finding jurisdiction over Yarbrough's killing of Land and Muha in Pennsylvania would require us to overlook the plain language of R.C. 2901.11(B), which defines the term "element" of the offense in homicide cases. Accordingly, we conclude that the trial court did not have subject-matter jurisdiction over Yarbrough's killing of Land and Muha in Pennsylvania under R.C. 2901.11(B).

{¶ 52} In their supplemental brief and at oral argument, Yarbrough's appellate attorneys suggested that Yarbrough could be indicted and tried in Ohio for complicity to murder Land and Muha. See R.C. 2901.11(A)(2). However, we find

---

1. See *State v. Kills on Top* (1990), 243 Mont. 56, 74–75, 793 P.2d 1273 (abduction in Montana, murder in Wyoming); *People v. Cullen* (Colo.App.1984), 695 P.2d 750, 751 (abduction in Colorado, murder in New Mexico); *State v. Poland* (1982), 132 Ariz. 269, 275, 645 P.2d 784 (acts of premeditation in Arizona, murder in Nevada, reversed on other grounds); *Lane v. State* (Fla.1980), 388 So.2d 1022, 1027–1028 (acts of premeditation in Florida, murder in Alabama); but, see, *People v. Holt* (1982), 91 Ill.2d 480, 484, 64 Ill.Dec. 550, 440 N.E.2d 102 (no jurisdiction over felony-murder where the kidnapping occurred in Illinois but the victim was murdered in Wisconsin). See, also, Kramer, Jurisdiction over Interstate Felony Murder (1983), 50 U.Chi.L.Rev. 1431.

that Yarbrough cannot be tried for complicity to commit aggravated murder of Land and Muha.

{¶ 53} To be sure, R.C. 2901.11(A)(2) gives Ohio trial courts the power to hear cases where the defendant, "[w]hile in this state, * * * conspire[d], or attempt[ed] to commit, or * * * is guilty of complicity in the commission of" an out-of-state crime. In other words, as long as the conspiracy, the attempt, or the complicity occurred in Ohio, the fact that the related crime or attempted crime occurred or was supposed to occur elsewhere does not generally deprive Ohio courts of their jurisdiction to hear the conspiracy or attempt or complicity charges.

{¶ 54} Homicide cases are treated differently in the criminal-jurisdiction statute, however. As we explained above, R.C. 2901.11(B) says that "the act that causes death, or the physical contact that causes death, or the death itself" must occur in Ohio if an Ohio trial court is to have jurisdiction to hear criminal homicide charges. The express and distinct provision governing jurisdiction in homicide prosecutions trumps the general language in the statute about Ohio courts' jurisdiction to hear conspiracy, attempt, and complicity charges involving myriad crimes. See *State ex rel. Belknap v. Lavelle* (1985), 18 Ohio St.3d 180, 182, 18 OBR 248, 480 N.E.2d 758 ("It is a well-established rule of construction that specific provisions prevail over general provisions").

{¶ 55} The jurisdiction that the General Assembly has created for homicide cases makes no exception for murder cases like Yarbrough's to be tried in Ohio. Under R.C. 2901.11, a murderer acting alone who plans his crime in Ohio and carries it out in another state cannot be tried in Ohio for his or her crime. We read nothing in the statutes that would produce a different result when the murderer plans the crime in Ohio with others before leaving the state to commit the homicide itself. The state is not permitted, in other words, to evade the express jurisdictional limit on homicide cases by recasting a homicide case as a complicity-to-commit homicide case that could, under R.C. 2923.03(F), carry the same penalty as the crime of homicide itself.

{¶ 56} Section 4(B), Article IV, of the Ohio Constitution gives the General Assembly the power to decide how broad or narrow the jurisdiction of the common pleas courts will be, and the General Assembly has chosen to set special limits on the power of those courts to hear homicide cases. We must respect that choice, for our "role is to interpret, not legislate." *Cablevision of the Midwest, Inc. v. Gross* (1994), 70 Ohio St.3d 541, 544, 639 N.E.2d 1154. Because the Land and Muha killings occurred in Pennsylvania, Ohio had no jurisdiction to hear any criminal charges involving those homicides.

{¶ 57} Hence, we vacate Yarbrough's convictions for aggravated murder in Counts 6 through 11 and Counts 13 through 18 of the indictment and dismiss

those counts for lack of subject-matter jurisdiction under R.C. 2901.11. However, we find that Ohio jurisdiction extends to Counts 1 through 5 (robbery, burglary, kidnapping of Land and Muha, and gross sexual imposition), Count 12 (the robbery of Vey), and Count 20 (theft of the Blazer).[2]

### Pretrial issues

{¶ 58} *Change of venue.* In proposition of law XIII, Yarbrough argues that the trial court erred by denying the defense motion for a change of venue.

{¶ 59} Yarbrough asserts that extensive media coverage following the murders of Land and Muha, coupled with the publicity surrounding the earlier trial of co-defendant, Nathan Herring, irreparably tainted his jury and denied him a fair trial. In support of this motion, trial defense counsel asserted that "[t]he television news, the local newspapers and the radio have made countless reports in reference to this case. The Sheriff, Prosecutor and families of the victim have appeared on the televised news, and made statements in print, regaling the community with the details of the crime."

{¶ 60} A motion for change of venue is governed by Crim.R. 18(B), which provides, "Upon the motion of any party or upon its own motion the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." However, Crim.R. 18(B) does not require a change of venue merely because of extensive pretrial publicity. Any decision on a change of venue rests in the trial court's discretion. *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 34; *State v. Landrum* (1990), 53 Ohio St.3d 107, 116–117, 559 N.E.2d 710.

{¶ 61} We have stated that a " 'careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " *Landrum,* 53 Ohio St.3d at 117, 559 N.E.2d 710, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749. Only in rare cases may prejudice be presumed. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304; see, also, *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 62} Our review of the voir dire examination does not support Yarbrough's claim of prejudicial pretrial publicity. During voir dire, all of the seated jurors

---

2. Given our holding herein, we do not address the issues raised by appellant in propositions I through X, XVI and XXII or those aspects of the remaining issues relating to the murder convictions and death penalty.

acknowledged hearing or seeing some news coverage about the case. However, they also stated that they could set aside whatever they may have read or heard about the case and would decide the case solely upon the evidence presented at trial. See *Landrum*, 53 Ohio St.3d at 117, 559 N.E.2d 710.

{¶ 63} Following voir dire, the defense did not challenge any of the seated jurors for cause due to pretrial publicity. The absence of any defense challenges for pretrial publicity against any of the seated jurors shows that, after voir dire examination, the defense was not particularly troubled by the jury's exposure to pretrial publicity. See *Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 37.

{¶ 64} Yarbrough has failed to show that the trial court abused its discretion in denying the defense motion for a change of venue. We reject proposition XIII.

{¶ 65} *Discovery.* In proposition of law XI, Yarbrough asserts that the state failed to disclose exculpatory and impeaching evidence in violation of *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215; *United States v. Bagley* (1985), 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481.

{¶ 66} Prior to trial, Yarbrough's counsel asked the prosecuting attorney to disclose all evidence, known or which might become known to him, that was favorable to the defendant and material either to guilt or punishment, as required by Crim.R. 16(B)(1)(f). In responding to the discovery request, the state made available to the defense the statements of witnesses and other information.

{¶ 67} On September 22, 2000, the day the jury returned its verdicts, a man, John H. Butler Jr., told defense counsel about an earlier assault on his son involving Herring, Young, and Brandon Crawford. Butler reported that on May 29, 1999, Herring, Young, and Crawford struck Butler's 22–year–old son with a scoped .44–caliber handgun. He also said that Herring, Young, and Crawford later stalked his home. According to Butler, he reported this incident to the Steubenville police and later learned from the police that "a .38 caliber firearm and another * * * automatic weapon" were recovered.

{¶ 68} On October 6, 2000, Yarbrough's counsel filed a motion for new trial because of the state's pretrial failure to provide the defense with this potentially exculpatory evidence concerning the Butler assault. On November 6, 2000, the trial court denied the motion.

{¶ 69} Suppression by the prosecution of evidence that is favorable to the accused and "material either to guilt or to punishment" is a violation of due process. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Evidence suppressed by the prosecution is material within the meaning of *Brady* only if there exists a " 'reasonable probability' " that the result of the trial would have been different had the evidence been disclosed to the defense. *Kyles v. Whitley*

(1995), 514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490, quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375, 87 L.Ed.2d 481. As the United States Supreme Court has stressed, "the adjective ['reasonable'] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555, 131 L.Ed.2d 490; see, also, *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 27.

{¶ 70} There is no indication that the prosecution "suppressed" the evidence Yarbrough complains about. Assuming, arguendo, that evidence of the Butler assault was suppressed, there was no due-process violation. Evidence that Herring, Young, and an unrelated third party struck Butler with a handgun did not exculpate Yarbrough as the offender in the burglary, robbery, and kidnapping of Land and Muha. The offenses were unrelated in time and involved different victims.

{¶ 71} Even assuming Butler's assault was relevant under Evid.R. 401, Yarbrough fails to explain how that evidence would have been admissible. Butler's affidavit is hearsay. There is no indication that Butler had any firsthand knowledge about his son's assault, the weapons used, or whether Herring and Young were involved in this unrelated offense.

{¶ 72} Based on the foregoing, we reject proposition XI.

### Trial issues

{¶ 73} *Gruesome photographs.* In proposition of law XIV, Yarbrough argues that the trial court erred by admitting, over defense objection, six crime-scene photographs of Land and Muha and one autopsy photo of Muha.

{¶ 74} Nonrepetitive photographs, even if gruesome, are admissible in capital cases as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 75} We have held that the homicide convictions entered against Yarbrough must be vacated. Therefore we need not consider whether the photographs introduced at trial were probative of Yarbrough's guilt or innocence of the crime of aggravated murder.

{¶ 76} The photographs introduced at Yarbrough's trial did not have a prejudicial effect as to his convictions of burglary, robbery, kidnapping, and gross sexual imposition. Overwhelming evidence, including his police statement and admis-

sions of guilt to Young and several jailhouse cellmates established Yarbrough's guilt of these offenses. Moreover, forensic testimony linked Yarbrough to the victims and the crime scene, and he was driving the stolen Blazer at the time of his arrest. Based on the foregoing, we reject proposition XIV.

{¶ 77} *Instructions on accomplice testimony.* In proposition of law XII, Yarbrough argues that the trial court erred by failing to instruct on the accomplice testimony of Brandon Young as required by R.C. 2923.03(D). However, Yarbrough failed to request such an instruction or object to the lack of such an instruction and thus waived all but plain error. Crim.R. 30(A) and 52(B); *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph one of the syllabus.

{¶ 78} Young testified that Yarbrough had admitted burglarizing, robbing, kidnapping, and then killing Land and Muha. Further, Young testified that Yarbrough had said he made the victims "suck each other's dick" before he killed them. Young denied any involvement in the murders. However, Young acknowledged entering into a plea agreement in exchange for his truthful testimony.

{¶ 79} The state maintained that Young was not involved in the murders. However, during the state's case-in-chief, the prosecutor introduced Yarbrough's pretrial statements to the police. In these statements, Yarbrough told police that Young had participated in the murders.

{¶ 80} R.C. 2923.03(D) states:

{¶ 81} "If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of * * * an offense, the court, when it charges the jury, shall state substantially the following:

{¶ 82} " 'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.' "

{¶ 83} As a result of Yarbrough's statements to the police, Young's credibility and status as an accomplice were before the jury, and the jury had to determine how much weight to give Young's testimony. However, we find no plain error. The defense was permitted wide latitude in cross-examining Young, and his plea agreement was presented to the jury. Moreover, the trial court's general instructions informed the jury how to weigh the credibility of the witnesses and included much of the substance of the statutory instruction on accomplices. See *State v. Sneed* (1992), 63 Ohio St.3d 3, 9–10, 584 N.E.2d 1160. Furthermore,

overwhelming evidence established Yarbrough's guilt. Based on the foregoing, we reject proposition XII.

{¶ 84} *Juror misconduct.* In proposition of law XVIII, Yarbrough claims that one juror and two alternate jurors violated his right to a fair trial by having contact with the victims' families during the trial.

{¶ 85} While the jury was deliberating during the guilt phase, the trial court was informed of reports of juror contact with the victims' families. The trial court then held a *Remmer* hearing to determine whether such improper contact had taken place. See *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654.

{¶ 86} Shantye Brown, a spectator at the trial, informed the court that when Juror Gallaher entered the jury box, Gallaher looked at a lady seated in the spectator section and "put her thumb up and * * * turned her head and smiled." According to Brown, another spectator "told [Brown] it was one of the boy's moms." Upon questioning, Gallaher denied giving a thumbs-up signal to anyone in the courtroom. Gallaher said, "I don't even know really truly who the victims' families are."

{¶ 87} During another alleged encounter over a lunch break, Brown observed one of the alternate jurors talking to "the families * * * on the other side." Brown also saw an alternate juror talking to one of the victims' family members during the lunch break. Chad Johnson, another spectator, said that he had observed two alternate jurors outside the courthouse and one of them was talking to a lady who Johnson thought was one of the victims' mothers. Finally, Doug Sibert, a spectator who was with Johnson, also said he saw an alternate juror talking to a lady outside the courthouse and that he had heard that "she was family."

{¶ 88} Juror Howell, one of the alternate jurors identified by the witnesses, denied talking to a lady or anyone else outside the front door of the courthouse during lunch. Joseph Antigo, the other alternate juror who was identified, also denied talking to anyone outside court.

{¶ 89} After hearing the witnesses, the trial court stated, "I've had occasion to interview everybody involved and quite frankly I don't think anything happened. I mean I don't see any problem here." The trial court then directed the jury to resume deliberations.

{¶ 90} A trial court may rely on a juror's testimony in determining that juror's impartiality. *State v. Herring* (2002), 94 Ohio St.3d 246, 259, 762 N.E.2d 940, citing *Smith v. Phillips* (1982), 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78. Moreover, issues concerning the weight given to the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10

Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Here, the trial court's ruling reflects that the court believed the juror and the two alternate jurors and apparently did not believe the spectators. Given the trial court's finding that no contact occurred, Yarbrough has failed to demonstrate that any juror misconduct occurred. Proposition XVIII is overruled.

{¶ 91} *Alternate jurors in deliberations.* In proposition of law XVII, Yarbrough argues that the trial court erred by permitting alternate jurors to remain in the jury room during deliberations. We agree.

{¶ 92} However, the defense did not object to the alternates' presence during the jury's deliberations and thus waived all but plain error. *United States v. Olano* (1993), 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (permitting alternate jurors to attend deliberations was not reversible error under the federal "plain error" standard). Here, there was no plain error. See *State v. Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 93} Former Crim.R. 24(F), which was in effect at the time of Yarbrough's trial, provided that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."[3] 34 Ohio St.2d lxvii. Despite the clear language of former Crim.R. 24(F), the trial court sent the alternate jurors into the deliberation room during the guilt-phase deliberations.

{¶ 94} Before the guilt-phase deliberations, the trial court instructed the alternates that they "will be there * * * but will not participate, will not speak, will not express an opinion, and won't vote. And it would be inappropriate for any of you to do that. You won't even sit at the deliberation table. You'll be off somewhere where you can see and hear but not participate * * *."

{¶ 95} The trial court "clearly erred" by "allowing the alternate jurors to remain present during deliberations." *State v. Jackson* (2001), 92 Ohio St.3d 436, 439, 751 N.E.2d 946; see, also, *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, at ¶ 43–50; *State v. Murphy* (2001), 91 Ohio St.3d 516, 531, 747 N.E.2d 765. However, nothing in the record indicates that the alternates disobeyed the judge's instructions or that their presence chilled the deliberative process. Cf. *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 129–134 (one alternate expressing feelings about other jurors and alternates " 'throwing pens and things' " during deliberations caused reversible error). Thus, we reject Proposition XVII.

{¶ 96} *Allied offenses.* In proposition of law XX, Yarbrough argues that he cannot be found guilty and sentenced for both receiving stolen property (the Blazer) and theft of that property because these crimes are allied offenses of

---

3. Crim.R. 24(F) was amended effective July 1, 2002. 96 Ohio St.3d XCIV–XCV.

similar import. However, the defense failed to raise this issue at trial and thus waived all but plain error. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; *State v. Comen* (1990), 50 Ohio St.3d 206, 211, 553 N.E.2d 640.

{¶ 97} Count 20 charged Yarbrough with the theft of Muha's Chevy Blazer, and Count 19 charged Yarbrough with receiving stolen property of an unnamed motor vehicle. Contrary to the state's claim that Count 19 related to Vey's BMW, the trial court's amended jury instructions specified that Muha's Blazer was the subject of Count 19.

{¶ 98} R.C. 2941.25(A) provides, "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."

{¶ 99} Although receiving stolen property is technically not a lesser included offense of theft, receiving stolen property and theft of the same property are clearly allied offenses of similar import. See *Maumee v. Geiger* (1976), 45 Ohio St.2d 238, 244, 74 O.O.2d 380, 344 N.E.2d 133; *State v. Botta* (1971), 27 Ohio St.2d 196, 204, 56 O.O.2d 119, 271 N.E.2d 776.

{¶ 100} The same facts were used to convict Yarbrough of stealing the Blazer and of receiving the Blazer as stolen property. Indeed, during closing argument summarizing the evidence on Counts 19 and 20, the prosecutor argued, "Given the testimony that you already know about the entry into 165 McDowell, and the burglary and the robbery and the kidnapping there's really no doubt that this Defendant stole that Chevy Blazer and was in possession of it and knew it was a stolen vehicle."

{¶ 101} Here, there was a single animus common to both offenses. Additionally, when the elements of each crime are aligned, the offenses " 'correspond to such a degree that the commission of one crime' " resulted " 'in the commission of the other.' " *State v. Rance* (1999), 85 Ohio St.3d 632, 638, 710 N.E.2d 699, quoting *State v. Jones* (1997), 78 Ohio St.3d 12, 14, 676 N.E.2d 80.

{¶ 102} Thus, convicting and sentencing Yarbrough both for receiving the stolen Blazer and for theft of the Blazer violated R.C. 2941.25(A). There was plain error affecting Yarbrough's "substantial rights," since he was sentenced to 18 months in prison for each offense. See *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240.

{¶ 103} Proposition XX has merit. Yarbrough's conviction for receiving stolen property (Count 19) shall be merged into his conviction for grand theft (Count 20), Count 19 is dismissed, and the 18–month sentence that Yarbrough received for Count 19 is vacated.

### Prosecutorial Misconduct

{¶ 104} In proposition of law XV, Yarbrough contends that he was denied a fair trial due to prosecutorial misconduct. However, unless otherwise noted, the defense did not object to the purported acts of prosecutorial misconduct and thus waived all but plain error. *State v. Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916.

{¶ 105} **Guilt-phase testimony.** Yarbrough complains that the prosecutor committed misconduct by eliciting testimony suggesting that Yarbrough was involved in gangs. Detective Lelless testified that when Yarbrough was interviewed on the day of the murders, Yarbrough was wearing a "Baltimore Orioles hat with gang writing on the inside bill."

{¶ 106} Gang membership and gang motivation became an issue at trial. Testimony about gang writing on Yarbrough's hat was relevant in countering Yarbrough's claim that he was not a gang member. Such evidence rebutted the defense theory that Young, not Yarbrough, belonged to a gang and had a motive to kill the two victims. During cross-examination, a police detective testified that Young was a member of the "Bloods." The defense also asked the detective during cross-examination whether "those Bloods dislike non African–Americans." Cf. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 26. Thus, there was no prosecutorial misconduct in asking about gang writing on Yarbrough's hat.

{¶ 107} **Guilt-phase argument.** First, Yarbrough claims that the prosecutor committed misconduct by arguing that Yarbrough "wasn't a savior, he wasn't an angel" when he protected Vey from being shot by Herring. The prosecutor told the jury that Yarbrough "was doing what he knew was the smart thing, not to kill Barbara Vey there. They just wanted to get her BMW and get out of Dodge and that's what they did."

{¶ 108} The defense opened the door to such argument. During the defense opening statement, counsel stated that Yarbrough performed "the sole acts of humanity" in this case when he saved Vey's life "by putting himself between Boo Herring's gun and Barbara Vey." Moreover, the prosecutor's comments represented fair comment and did not result in plain error.

{¶ 109} Second, Yarbrough contends that the prosecutor misbehaved by speculating about Yarbrough's motive for not killing Porter. The prosecutor argued that Yarbrough did not kill Porter because "it's broad daylight * * * and this Defendant has what he wants. He's got a vehicle. He's got more than $200. He's got a Chevy Blazer. He doesn't need anything from Brian Porter other than a ride to the gas station." As with Vey, the defense opened the door to the state's argument. During the defense opening statement, counsel indicated that Yarbrough also spared Porter's life. Again, the prosecutor's argument was fair comment and did not result in plain error.

{¶ 110} Third, Yarbrough argues that the prosecutor committed misconduct by arguing that associating with bad people and being a suspicious outsider from Pittsburgh were evidence of guilt. The prosecutor's argument that "Yarbrough is just this guy from Pittsburgh" focused on rebutting Yarbrough's statement to police that he was an outsider who just happened to arrive in Steubenville near the time of the murders. The prosecutor's argument that Yarbrough "sought out and chose" Steubenville "hoodlums and criminals" to be his friends helped make the point that Yarbrough was not just a bystander in these offenses. Thus, the prosecutor's argument supported the state's theory of the case and did not constitute plain error.

{¶ 111} Finally, Yarbrough argues that the prosecutor erred in concluding his argument by thanking the jury "on behalf of the victims' families for being as patient and attentive as [it has] been." Such concluding remarks did not result in plain error. Cf. *State v. Goodwin* (1999), 84 Ohio St.3d 331, 339, 703 N.E.2d 1251 ("Merely mentioning the personal situation of the victim's family, without more, does not constitute misconduct").

{¶ 112} **Cumulative error.** Yarbrough also argues that the cumulative effect of prosecutorial misconduct denied him a fair trial. However, our review of the record shows that Yarbrough received a fair trial, and any error was nonprejudicial. Moreover, "[s]uch errors cannot become prejudicial by sheer weight of numbers." *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068.

{¶ 113} Because none of Yarbrough's claims establish prosecutorial misconduct, proposition XV is overruled.

### Ineffective assistance of counsel

{¶ 114} In proposition of law XIX, Yarbrough argues that he received ineffective assistance of counsel. Reversal of convictions on the basis of ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 115} First, Yarbrough contends that his defense counsel were ineffective by failing to file a motion to suppress evidence seized from him as the result of his warrantless arrest. Yarbrough argues that his counsel erred by failing to challenge within 48 hours of his being taken into custody whether the police had had probable cause to arrest him. However, the record is unclear as to whether Yarbrough's defense counsel appeared before a magistrate and filed such a motion.

{¶ 116} Nevertheless, any motion to suppress for the lack of probable cause to arrest Yarbrough would have failed. Police properly arrested Yarbrough for driving Muha's stolen Blazer and then fleeing. Moreover, at the time of Yarbrough's arrest, there was an outstanding warrant for his arrest on attempted-murder charges in Pennsylvania.

{¶ 117} Counsel is not per se ineffective for failing to file a motion to suppress. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, citing *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305. Moreover, counsel is not deficient for failing to raise a meritless issue. *State v. Taylor* (1997), 78 Ohio St.3d 15, 31, 676 N.E.2d 82. Thus, Yarbrough has failed to show that his counsel's performance was deficient. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 118} Yarbrough raises other instances of alleged ineffectiveness of counsel but none of these prejudiced him. Id. As discussed in other propositions, Yarbrough was not prejudiced by his counsel's failure to request an instruction on accomplice testimony in relation to Young's testimony (XII), or by his counsel's failure to object to prosecutorial misconduct (XV), and he was not prejudiced by his counsel's failure to object to the presence of alternate jurors in the jury room during deliberations (XVII).

{¶ 119} We also reject Yarbrough's contention that his counsel was ineffective for not objecting to instructions on reasonable doubt. Our review of the record discloses that his counsel did object.

{¶ 120} Finally, Yarbrough argues that the cumulative effect of his counsel's ineffective assistance necessitates reversal. Nevertheless, Yarbrough received a fair trial on the noncapital charges. The error presented in Proposition XX is now corrected. See *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 123.

{¶ 121} In summary, none of Yarbrough's claims establish ineffective assistance of counsel. Proposition XIX is overruled.

### Settled issue

{¶ 122} In proposition of law XXI, Yarbrough disputes the constitutionality of the trial court's instructions on reasonable doubt in R.C. 2901.05(D). However, we have repeatedly affirmed the constitutionality of R.C. 2901.05(D). See *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163. Proposition XXI is overruled.

### Conclusion

{¶ 123} We find that under R.C. 2901.11, the trial court lacked subject-matter jurisdiction over the aggravated-murder charges on which Yarbrough was tried

and convicted. Accordingly, we dismiss Counts 6 through 11 and Counts 13 through 17 and vacate the defendant's sentence of death. Further, we dismiss the charge of receiving stolen property in Count 19 because charges for receiving stolen property and theft of the Chevrolet Blazer are allied offenses of similar import. We affirm the jury's verdict and the trial court's sentence on the remaining counts.

Judgment affirmed in part
and reversed in part.

RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DON-NELL, JJ., concur.

––––––––

Christopher Becker, Jefferson County Assistant Prosecuting Attorney, for appellee.

David H. Bodiker, Ohio Public Defender, Joseph E. Wilhelm, Appellate Supervisor, Death Penalty Division, Kelly Culshaw, and Kyle E. Timken, Assistant Public Defenders, for appellant.