O’Connor, C.J.,
dissenting.
{¶ 54} The jurisdictional error in this case bears a remarkable resemblance to the one we unanimously corrected in State v. Yarbrough, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845. Here, as in Yarbrough, our duty compels an outcome that is regrettable because of the grief it would cause the family and friends of the victim. But it is an outcome that is necessary to preserve the integrity of the criminal-justice system in Ohio. As we stated in Yarbrough, one expects diligence by those participating in the prosecution of a defendant subject to the ultimate penalty of death; failing to ensure that this state has jurisdiction in such a case is a tremendous error and is a disservice to the citizens of Ohio and the victims of violent crime. Id. at ¶ 4. We cannot ignore our duty to correct such an error.
{¶ 55} The majority correctly finds that the evidence does not support the state’s theory that Amber Garrett was killed in appellant Jeffrey Wogenstahl’s *584 apartment in Ohio. But I disagree with the majority’s conclusion that there is proof beyond a reasonable doubt that the murder could have occurred in Ohio. Based on the chronology of events established by the testimony of the state’s own witnesses, it can reasonably be determined that Amber was murdered in Indiana. Thus, the statutory presumption in R.C. 2901.11(D) permitting Ohio to exercise jurisdiction over Wogenstahl’s aggravated-murder charge does not apply. Accordingly, I respectfully dissent.
{¶ 56} The majority holds that “a rational trier of fact could not have concluded that Amber was killed in Wogenstahl’s apartment,” which is in Ohio, in part because “the timeline established by the evidence * * * erodes the state’s theory.” Majority opinion at ¶ 41. That same timeline makes it impossible for a rational trier of fact to conclude that she was killed anywhere in Ohio.
{¶ 57} The state’s witnesses established a clear and consistent timeline. Eric, Amber’s sibling who was babysitting Amber on the night she disappeared, testified that Wogenstahl arrived at their apartment around 3:00 a.m. Eric’s estimate of Wogenstahl’s arrival time is consistent with the testimony of Amber’s mother, Peggy Garrett, who stated that she was with Wogenstahl at the Flicker Inn from approximately 2:20 a.m. until she left for Waffle House, which she reached around 3:00 or 3:15 a.m. Taken together, the testimony of Eric and Garrett establish that the events that led to Amber’s murder began, at the earliest, around 3:00 a.m.
{¶ 58} According to Eric’s testimony, Wogenstahl spent “five or ten minutes” in the Garretts’ home before departing with Eric on the pretextual trip to Troy Beard’s apartment. Here again, Eric’s testimony sets the time parameters: it was 3:10 a.m. when Wogenstahl dropped him off a block away from Beard’s apartment and “close to 3:30” by the time Eric walked back home to find the door unlocked and Amber gone. Thus, the testimony established that Amber was abducted no earlier than 3:10 a.m. and no later than 3:30 a.m.
{¶ 59} The UDF employee’s testimony was consistent with and further narrowed this timeline. She testified that she saw Wogenstahl and a young female passenger drive past the UDF, heading south on the Indiana side of State Street at 3:15 a.m. The critical detail in the employee’s testimony is that the passenger, who must have been Amber, was alive at the moment the car passed the UDF.
I seen what looked like they were getting up and stretching and then laying back on the car door asleep.
[[Image here]]
* * * All I could tell from the silhouette [of the passenger] was that when the person moved that there was a little bit of hair that moved forward and then it was brushed back a little bit and they laid back down.
*585 {¶ 60} This fact merits emphasis: the UDF employee saw Wogenstahl’s vehicle traveling south on State Street (i.e., moving from right to left past the employee standing in front of the UDF store and facing State Street). The state line runs down the middle of State Street. So when the UDF employee saw Amber alive at 3:15 a.m., Wogenstahl and his victim had already crossed over into Indiana.
{¶ 61} As the majority concedes, the west side of State Street, the southbound lane, does not reenter Ohio. Majority opinion at ¶ 42. Instead, State Street becomes Jamison Road, which runs southwest entirely in Indiana.
{¶ 62} Twenty-five minutes after Wogenstahl passed the UDF store, multiple witnesses saw him and/or his parked car along the side of Jamison Road in Indiana, at a spot roughly four miles from Harrison. Three of the witnesses were drivers of passing cars, and they each testified that Wogenstahl’s car was at the Jamison Road location in Indiana at approximately 3:40 a.m. Amber’s body was discovered in the vicinity where the witnesses saw Wogenstahl’s car stopped on the side of Jamison Road.
{¶ 63} Amber died from multiple stab wounds and from blunt trauma to her head; either would have been fatal. One passing motorist testified that he saw Wogenstahl’s car with its trunk open by the side of Jamison Road in Indiana at approximately 3:40 a.m. And as he passed the car, the witness saw a man who “looked like [he] was getting something out of the trunk maybe.” Police later found an automobile jack in the trunk of Wogenstahl’s car that was missing its handle. And the deputy coroner testified that the blunt-trauma injuries to Amber’s head were consistent with having been caused by a jack handle. Taken together, the testimony of the motorist and the coroner strongly support the conclusion that the assault that caused these injuries occurred by the side of Jamison Road in Indiana. By “around 3:45 or 4 o’clock,” according to the UDF employee, Wogenstahl was back in Harrison, where the UDF employee saw him at the self-serve car wash.
{¶ 64} Thus, the evidence reasonably suggests that Amber was alive when she was taken from Ohio, that she was seen alive in Wogenstahl’s vehicle in Indiana, that the vehicle in which she was traveling did not return to Ohio with her in it, that she was assaulted in Indiana, and that she died in Indiana.
{¶ 65} Rather than draw the obvious conclusion from the evidence, the majority holds that Ohio had jurisdiction based on the supposition that “[t]he fatal injuries may have been inflicted earlier” than 3:15 a.m., when Amber was seen alive in Wogenstahl’s car in Indiana. Majority opinion at ¶ 43. But the evidence does not support this conjecture, and in fact, the evidence presented at trial does not allow for this possibility.
*586 {¶ 66} If Wogenstahl inflicted the fatal injuries in Ohio earlier than 3:15 a.m., then he took only five minutes to drive from where he dropped Eric off near Beard’s apartment (which he did at 3:10 a.m.) to the Garretts’ home, break in, abduct Amber, inflict the fatal injuries, then drive with Amber on the Indiana side of State Street (where he was seen driving past with Amber at 3:15 a.m.).
{¶ 67} But there is no evidence that this hypothetical scenario occurred. Investigators found no blood in Amber’s home, and the blood found in Wogen-stahl’s apartment did not indicate Amber as the source.[6] The UDF employee did not testify that the girl in the car was bloody or appeared to be in distress. And the only blood evidence found in the car—a spot measuring 1/25 the size of a dime on the rear, driver-side interior door handle—was inconclusive and may have been as much as ten years old.
{¶ 68} In the alternative, the majority adopts the state’s suggestion that after passing the UDF at 3:15 a.m., Wogenstahl may have diverted back into Ohio before the motorists saw him on Jamison Road in Indiana at 3:40 a.m. The majority states, “[Tjhere are side streets that intersect State Street that do lead into Ohio, and Wogenstahl could have turned down one of them before returning to Indiana.” (Emphasis added.) Majority opinion at ¶ 43. The state nominates Sunset Avenue and Whitewater Drive as possible routes back into Ohio. What is the basis for this conjecture?
{¶ 69} The UDF is on the corner of State and Sunset.[7] The UDF employee testified that when she saw Wogenstahl’s car at 3:15 a.m., it “was going too fast” to turn into the UDF and it “kept on going by.” This testimony precludes any possibility that Wogenstahl turned onto Sunset Avenue. And the prosecution’s timeline makes it a virtual impossibility that Wogenstahl had time for a side trip by turning east on Whitewater Drive.
{¶ 70} Thus, although there is evidence that the fatal injuries and the death both occurred in Indiana, there is no evidence that either the injuries or the death occurred in Ohio. Nonetheless, the majority asserts that either scenario is equally likely so it cannot reasonably be determined in which state the murder took place. I disagree. Conjecture cannot establish beyond a reasonable doubt that the offense could have taken place in Ohio.
*587 {¶ 71} Based on the record, it is not reasonably ambiguous where the fatal injuries or death occurred. The evidence points to Indiana. As a result, the state of Ohio had no jurisdiction pursuant to R.C. 2901.11 over Wogenstahl’s murder charge. Thus, his aggravated-murder conviction is void and should be vacated. Wogenstahl’s remaining convictions for kidnapping and aggravated burglary, crimes that the state did demonstrate occurred in Ohio, would not be disturbed by this holding.
{¶ 72} Because Wogenstahl’s Ohio conviction for aggravated murder is void for lack of jurisdiction, double jeopardy would not bar his retrial in Indiana. See, e.g., In re S.J., 106 Ohio St.3d 11, 2005-Ohio-3215, 829 N.E.2d 1207, ¶ 14 (noting that a claim of former jeopardy cannot be based on a void judgment); Montana v. Hall, 481 U.S. 400, 402, 107 S.Ct. 1825, 95 L.Ed.2d 354 (1987), quoting United States v. Scott, 437 U.S. 82, 90-91, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) (“It is a Venerable principle] of double jeopardy jurisprudence’ that ‘the successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence to support the verdict, * * * poses no bar to further prosecution on the same charge’ ” [brackets sic]). And any purported uncertainty as to the location of the murder will not benefit Wogenstahl a second time. Under current Indiana law, “[i]f the body of a homicide victim is found in Indiana, it is presumed that the result occurred in Indiana.”[8] Ind.Code 35-41-l-l(c). This jurisdictional provision has been substantively unchanged since it was enacted in 1976. See Ind. Acts 1976, Pub.Law No. 148-1976, section 1. Therefore, it appears that Wogenstahl will not be able to escape the jurisdiction of the Indiana courts.[9]
{¶ 73} As we recognized in Yarbrough, “[t]he General Assembly has not authorized an Ohio court of common pleas to exercise jurisdiction over the prosecution of a defendant for the crime of aggravated murder when, as here, the killing occurred in another state.” 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, at ¶ 1. Pursuant to the version of R.C. 2901.11 in effect at the time of this crime, the state of Ohio had no jurisdiction to try Wogenstahl for murder. His aggravated-murder conviction is void and should be vacated, and Wogenstahl should be tried in Indiana for the murder.
{¶ 74} For these reasons, I dissent.
O’Neill, J., concurs in the foregoing opinion.
*588 Joseph T. Deters, Hamilton County Prosecuting Attorney, and Philip R. Cummings and Sean M. Donovan, Assistant Prosecuting Attorneys, for appellee.
Timothy Young, Ohio Public Defender, and Kimberly Rigby and Elizabeth Arrick, Assistant Public Defenders, for appellant.

. Although the majority does not adopt the theory, the state suggests that the blood evidence is relevant to permit a finding of jurisdiction in Ohio under R.C. 2901.11(B), which provides that a victim’s death is presumed to have occurred in Ohio if any part of the victim’s body is found in the state. But the blood was not conclusively linked to Amber. And the suggestion that blood would be considered “any part of the body” under the statute is a novel theory that would be inappropriately adopted here given the absence of any link between the blood and the victim.

. https://www.google.eom/maps/@39.2552694,-84.8191324,19.55z.

. The Indiana statute makes clear that, in homicide cases, “result” refers to “either the death of the victim or the bodily impact causing death.” Ind.Code 35-41-l-l(e).

. I note that Indiana law permits imposition of the death penalty in cases of felony murder predicated on kidnapping, Ind.Code 36—50—2—9(b)(1)(E), as well as for the murder of a person under the age of 12, Ind.Code 35—50—2—9(b)(12). The same provisions were in effect in November 1991, at the time of the crime. See Ind. Acts 1990, Pub.Law No. 1-1990, section 354.