[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Wogenstahl,* Slip Opinion No. 2017-Ohio-6873.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-6873

THE STATE OF OHIO, APPELLEE, *v.* WOGENSTAHL, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Wogenstahl,* Slip Opinion No. 2017-Ohio-6873.]

*Reopened direct appeal of capital-murder conviction—Ohio trial court had jurisdiction over aggravated-murder charge under R.C. 2901.11(D) because the victim was killed in either Ohio or Indiana and it cannot reasonably be determined in which state the murder took place—Judgment affirmed.*

(No. 1995-0042—Submitted April 4, 2017—Decided July 25, 2017.)

REOPENED APPEAL from the Court of Appeals for Hamilton County,

No. C-930222.

_____

KENNEDY, J.

{¶ 1} Appellant, Jeffrey Wogenstahl, was convicted of the 1991 kidnapping and murder of ten-year-old Amber Garrett. Her body was discovered in a wooded area in Bright, Indiana. We reopened Wogenstahl's direct appeal of his capital-

murder conviction to consider a single question: Did the trial court have jurisdiction over Wogenstahl's aggravated-murder charge?  *See* 145 Ohio St.3d 1455, 2016-Ohio-2807, 49 N.E.3d 318; 145 Ohio St.3d 1467, 2016-Ohio-2956, 49 N.E.3d 1310.

{¶ 2} We now answer that question in the affirmative.  Because we find that it cannot be determined whether Amber Garrett was murdered in Ohio or Indiana, we hold that Ohio had jurisdiction over the aggravated-murder charge under R.C. 2901.11(D).

{¶ 3} Wogenstahl asserts three propositions of law: (1) "An Ohio court lacks subject matter jurisdiction when the state fails to prove such jurisdiction beyond a reasonable doubt.  Any resulting conviction is void and violates a defendant's constitutional rights to fair trial and due process.  U.S. Const. amends. VI and XIV," (2) "A defendant is denied the effective assistance of counsel, when a trial court lacks subject matter jurisdiction and defense counsel fails to raise the issue.  U.S. Const. amends. VI and XIV," and (3) "Trial of a defendant in a court without subject matter jurisdiction would necessarily violate the defendant's substantive and procedural constitutional rights to a fair trial and due process.  U.S. Const. amends. VI and XIV."  Because we determine, in addressing the first proposition of law, that the evidence shows that the trial court did have jurisdiction here, the second and third propositions of law are moot.

### *Evidence at trial*

{¶ 4} Amber Garrett lived in Harrison, Ohio, with her mother, Peggy, and four siblings.  On the night of November 23, 1991, Peggy Garrett asked her 16-year-old son, Eric, to babysit for Amber and two of her siblings.  Peggy left home after 11:00 p.m. to meet her friend, Lynn, at a nearby bar.

{¶ 5} Sometime later that night, Peggy and Lynn drove to a second bar, the Miamitown Lounge, where they saw Wogenstahl.  Peggy had known Wogenstahl

2

for about six weeks.[1]  At the Miamitown, she told him that her son Justin was gone for the weekend and that Eric was home with the other children.

{¶ 6} Peggy, Lynn, and Wogenstahl left the bar to smoke marijuana together in Wogenstahl's car, and when they went back in, the bar was closing. They went to another bar, the Flicker Inn, for a drink.  Peggy estimated that they arrived around 2:20 a.m.

{¶ 7} When the Flicker Inn was closing, Wogenstahl invited the women back to his apartment to smoke more marijuana.  They declined.  Peggy and Lynn parted from Wogenstahl and went to a Waffle House, arriving around 3:00 or 3:15 a.m.

{¶ 8} Meanwhile, around 3:00 a.m., Wogenstahl knocked on the door of the Garretts' apartment.  He told Eric that Peggy needed him at Troy Beard's apartment, which was three blocks away.  It took Eric five or ten minutes to dress, after which he left the house with Wogenstahl, locking the door behind him.

{¶ 9} According to Eric, Wogenstahl drove him to within a block of Beard's apartment but would not drive any closer because he did not want Peggy to see him giving Eric a ride.  He promised to pull around the block and wait for Eric.  But when Eric reemerged from Beard's apartment building, after discovering that Peggy had not been there all evening, Wogenstahl was gone.

{¶ 10} After looking around a few minutes, Eric walked home.  He arrived to find the door closed but unlocked.  Concerned, he checked on the children, and he discovered that Amber was not there.  However, he thought that maybe she had never been in the bedroom at all that night, that "maybe she spent the night with one of her friends," and that he had just assumed all night she was sleeping in the bedroom.

---

[1] It is unclear how well Wogenstahl knew the Garrett family, but there are indications that they were on friendly terms.  For example, Peggy testified that on the afternoon of November 23, Wogenstahl had "dropped by" the apartment to ask Peggy if she planned to do anything that night.

**{¶ 11}** According to Eric, it was 3:10 a.m. when he arrived at Beard's apartment. And it was "close to 3:30" when he returned to the apartment and found that Amber was gone.

**{¶ 12}** Wogenstahl admitted going to the Garretts' apartment at 3:00 a.m. Initially, he told police that he was playing a prank, alleging that he and Eric "always mess with each other." At trial, he testified that he had gone to the apartment to buy marijuana from Eric. He told the jury, "Eric had asked me would I give him a ride down to where Peggy was so he could give her a quarter ounce of reefer." He claimed that after driving Eric to a spot near Beard's apartment, he went home to bed.

**{¶ 13}** The town of Harrison, where Amber Garrett lived, sits on the Ohio-Indiana border. State Street is the dividing line between Harrison, Ohio, and West Harrison, Indiana; the state line runs down the middle of the street. To get from Harrison to Bright, Indiana, one follows State Street south until it curves and crosses fully into Indiana, at which point it becomes Jamison Road. The distance from Harrison, Ohio, to the place where Amber's body was found is approximately four miles.

**{¶ 14}** At 3:15 a.m. on November 24, an employee working at a United Dairy Farmers ("UDF") store on State Street in Harrison saw a car drive past on State Street, headed toward Bright. The driver was a man. As it passed the UDF, the interior of the car was illuminated by the headlights of another vehicle, and she was able to see two people inside. She later testified:

A:    * * * I seen a male silhouette and what looked like to be a young girl sitting in the seat. First I could not tell until she had moved.

Q:    Did you see some movement in the car?

A:    Yes.

4

Q:     What did you see?

A:     I seen what looked like they were getting up and stretching and then laying back on the car door asleep.

Q:     Were both people in the front seat of the car?

A:     Yes, they were.

{¶ 15} Four miles away, a resident on Jamison Road, awoke in the middle of the night to use the restroom. On the way, he noted that the time on his digital clock was 3:13 a.m. Sometime after he returned to bed, he heard an automobile driving up the road. Looking out the window, he saw a car driving slowly down Jamison Road in the direction of Harrison, as if coming from Bright. When the car reached a curve in the road near his home, he saw it pull off to the side of the road, and he saw the headlights go out. On direct examination, he testified that he had heard the car "maybe five minutes or longer" after returning to bed from using the restroom, but on cross-examination, he indicated that he had fallen "partially asleep" and could not say what time it was when he heard the car.

{¶ 16} Three people testified that they had passed the stopped car on Jamison Road that night. At "right around 3:38, 3:39, 3:40," a female motorist drove down Jamison Road, traveling from her job in Harrison to her home in Bright. She saw a car on the side of the road with its headlights off and a man standing by the rear door on the driver's side of the car.

{¶ 17} At approximately 3:40 a.m., a male motorist passed a car stopped on the roadside with its headlights off and its trunk open. He saw a man at the back of the car near the open trunk.

{¶ 18} Finally, also around 3:40 a.m., a second male motorist saw the car parked on the side of the road. He was driving from Bright toward Harrison and came upon the vehicle. As he drove past, someone in the car turned the headlights on, but he did not see the car pull back onto the road.

**{¶ 19}** Shortly thereafter, around 3:45 or 4:00 o'clock, the UDF employee again saw the car she had seen drive past earlier in the direction of Bright. It was parked at a self-serve car wash cater-cornered from the UDF. The car then pulled into the UDF lot, and the driver came in to buy cigarettes. She testified that he had what looked like blood and dirt under his fingernails. He then left and drove up State Street in the direction away from Bright.

**{¶ 20}** The UDF employee, the first male motorist, and the female motorists each identified Wogenstahl as the man they had seen that night, and all three, and the second male motorist, agreed that the picture of Wogenstahl's car matched his or her memory of the car he or she had seen that night.

**{¶ 21}** Peggy Garrett reported her daughter missing on the afternoon of Sunday, November 24. Police searched for Amber for three days without success. And then on Wednesday, November 27, the Jamison Road resident directed police to the spot where he had seen the car pull off along Jamison Road. Police discovered Amber's body down a steep embankment, in an area overgrown with prickly bushes and weeds, not far from the spot where witnesses had seen the car parked on Jamison Road.

**{¶ 22}** The cause of death was multiple stab wounds and blunt trauma to the head. The deputy coroner testified that the stab wounds alone would have been fatal and that the head trauma alone would have been fatal. Amber had 11 stab wounds to her neck, shoulder, chest, and armpit, as well as defensive wounds on her forearms. The blunt-trauma injuries were consistent with having been caused by an automobile jack handle. In the trunk of Wogenstahl's car, police found a jack with a missing handle.

**{¶ 23}** The state presented evidence that the murder had not occurred in the area where Amber's body had been found. The deputy coroner testified that it was reasonable to conclude that she had been carried through the thorny area after she was killed. He based this conclusion on two observations. First, the multiple thorn

6

scratches on her body "appear[ed] to be postmortem injuries." Second, her bare feet were clean and unscratched, suggesting that she had not walked through the area.

{¶ 24} Amber's body was discovered in Bright, Indiana. But the state offered no theory as to where she had been murdered.

### *Procedural background*

{¶ 25} Count 1 of the indictment against Wogenstahl alleged that he purposely caused the death of Amber Garrett in Hamilton County, Ohio. In closing argument at trial, the state took the position that *venue* was proper in Ohio so long as the kidnapping occurred here and that it was therefore unnecessary for the state to prove where the murder occurred. But the question of *jurisdiction* was never directly raised.

{¶ 26} Wogenstahl was convicted of aggravated murder (with three capital specifications), kidnapping, and aggravated burglary and was sentenced to death. His convictions and capital sentence were affirmed on direct appeal. 1st Dist. Hamilton No. C-930222, 1994 WL 686898; 75 Ohio St.3d 344, 662 N.E.2d 311 (1996).

{¶ 27} On October 9, 2015, he filed a motion to stay his execution and reopen his appeal, alleging that the trial court had lacked jurisdiction over the aggravated-murder charge. Because a challenge to subject-matter jurisdiction cannot be waived or forfeited and may be raised at any time, *State v. Mbodji*, 129 Ohio St.3d 325, 2011-Ohio-2880, 951 N.E.2d 1025, ¶ 10, this court granted the motion and agreed to review the case to determine whether the trial court had properly exercised jurisdiction over the aggravated-murder charge. 145 Ohio St.3d 1455, 2016-Ohio-2807, 49 N.E.3d 318; 145 Ohio St.3d 1467, 2016-Ohio-2956, 49 N.E.3d 1310.

*Analysis*

**{¶ 28}** At the time of Amber's murder and until 2005, R.C. 2901.11, Ohio's criminal-law jurisdiction statute, provided:

> (A) A person is subject to criminal prosecution and punishment in this state if any of the following occur:
>
> (1) The person commits an offense under the laws of this state, any element of which takes place in this state.
>
> * * *
>
> (B) In homicide, the element referred to in division (A)(1) of this section is either the act that causes death, or the physical contact that causes death, or the death itself. If any part of the body of a homicide victim is found in this state, the death is presumed to have occurred in this state.

Am.Sub.H.B. No. 565, 147 Ohio Laws, Part II, 4493, 4498 (eff. March 30, 1999 through July 12, 2005); Am.Sub.H.B. No. 511, 134 Ohio Laws, Part II, 1866, 1893-1894 (in effect at the time of Amber's murder). In *State v. Yarbrough* (decided after Wogenstahl's conviction), this court construed the statute to mean that "a murderer acting alone who plans his crime in Ohio and carries it out in another state cannot be tried in Ohio for his or her crime." 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, ¶ 55. Yarbrough kidnapped two people in Steubenville, Ohio, then drove them across the state line to Washington County, Pennsylvania, where he shot them. *Id*. at ¶ 6-10. This court reversed Yarbrough's aggravated-murder convictions because the trial court had lacked subject-matter jurisdiction, but it affirmed his convictions for robbery, burglary, and kidnapping. *Id*. at ¶ 1.[2]

---

[2] In 2005, the General Assembly amended R.C. 2901.11 prospectively in response to *Yarbrough*. Sub.S.B. No. 20, 151 Ohio Laws, Part I, 10.

**{¶ 29}** In *Yarbrough*, there was no dispute that the fatal shots occurred in Pennsylvania and that the victims died there. In this case, the location of the murder is in dispute. Wogenstahl contends that the evidence at trial proved that Amber was killed in Indiana. But the state claims that the evidence supports a theory that Amber was killed in Wogenstahl's Ohio apartment. Under R.C. 2901.11(D), which is the same now as it was at the time of the murder, the trial court had jurisdiction if the evidence establishes that the murder occurred in Ohio or if the evidence is insufficient to say with confidence in which state the murder occurred. R.C. 2901.11(D) provides:

> When an offense is committed under the laws of this state, and it appears beyond a reasonable doubt that the offense or any element thereof took place either in Ohio or in another jurisdiction or jurisdictions, but it cannot reasonably be determined in which it took place, the offense or element is conclusively presumed to have taken place in this state for purposes of this section.

**{¶ 30}** Although we find that the evidence does not support the state's theory that Amber was murdered in Wogenstahl's apartment, we also find that it does not prove, as Wogenstahl asserts, that she was murdered in Indiana.

*Evidence that the state asserts supports its theory that*
*the murder occurred in Wogenstahl's apartment*

**{¶ 31}** In its brief, the state asserts the theory that Amber was murdered in Wogenstahl's apartment in Ohio. Describing Wogenstahl's bathroom as "littered with blood smears and stains," the state contends that it is reasonable to conclude

that the act that caused Amber's death occurred in Wogenstahl's Ohio apartment. But the state has overstated the probative value of the blood evidence.

{¶ 32} Two towels with small bloodstains were recovered from Wogenstahl's apartment. Testing of one towel indicated that the blood was from a human but was not from Amber. Testing of the other towel was inconclusive as to whether the blood was from a human or an animal. This is significant because Wogenstahl testified that just days before Amber's murder, his cat fell off the shower-curtain rod, knocking out a tooth and bleeding on the side of the tub and the toilet. Police also recovered a paper napkin "with a single drop of what appeared to be blood on it." However, the serology report does not indicate that a napkin was tested for blood.

{¶ 33} Finally, investigators recovered "very small amounts" of blood from the outside of Wogenstahl's bathtub. But the blood from the bathtub was never typed. In fact, contrary to the state's description of a room "littered with blood smears and stains," the reason the blood found in the bathroom was not tested to determine whether it was human blood is that the specimens were so small that such testing would have consumed the entire sample.

{¶ 34} In summary, there is no evidence to support the theory the state advances in its brief because there was no evidence that Amber's blood was found in Wogenstahl's apartment. To the contrary, she was affirmatively excluded as the source of at least one stain. The evidence at trial never eliminated Wogenstahl as the source of the small amount of blood found in his own bathroom. And the quantities of blood found were quite small, although Amber was stabbed at least 11 times.

{¶ 35} In addition to the blood evidence, the state asserts that the fact that gum wrappers were found in Wogenstahl's apartment indicates that she was murdered there. The gum wrappers are significant, the state argues, because the deputy coroner testified that he had found a wad of chewing gum in Amber's

esophagus and concluded that Amber either swallowed it just prior to her death or partially regurgitated it near the time of her death.

{¶ 36} The gum wrappers suggest, at most, that Amber may have been in Wogenstahl's apartment at some time. But no testimony matched the type of gum in her esophagus to the wrappers in the apartment. And even if the gum did match the wrappers, it would not prove that she was stabbed or bludgeoned in the apartment.

{¶ 37} Finally, the state relies on the testimony of Bruce Wheeler, a jailhouse informant. Wheeler offered an ambiguous account of the crime based on the details that Wogenstahl allegedly confessed to him.

> Q:      So he took her out of this house. Did he say where he went with her?
>
> A:      No. He didn't say where but he said he took her in his car.

According to Wheeler, Wogenstahl raped Amber twice,[3] and on the second occasion, she fought back, which is when Wogenstahl stabbed her.

> Q:      Did he tell you what he did with Amber Garrett's body after he had taken her life?
>
> A:      Yeah. He told me *she was in his car* and he told me he took her somewhere to dump her * * *. * * *
>
> * * *

---

[3] Wheeler's testimony regarding the rapes was contradicted by the coroner, who testified there was no evidence of sexual abuse.

Q:      Now you said that he took her out in the car and he played with her?

A:      Yes.

(Emphasis added.)  Although far from dispositive, Wheeler's account suggests that the entire sequence of events occurred in the car, not in Wogenstahl's apartment. His testimony does not establish whether the car was in Ohio or Indiana at the time of the murder.

{¶ 38} Elsewhere in his testimony, Wheeler, describing the evidence that Wogenstahl got rid of after the crime, said, "He told me he threw the key [to the Garretts' apartment][4] in the woods earlier and he said some towels or sheets or one of the two or some kind of wrapping that he wrapped her in at one time."  The state seizes on this statement as proof that Amber must have been in Wogenstahl's apartment at the time of the attack.  According to the state, if he killed Amber in the car, then "it is illogical that he would then take the time to wrap her in some towels or sheets he conveniently had in his car before taking her body the short distance into those bushes."

{¶ 39} The state's argument assumes more facts than Wheeler supplied. Wheeler never said that Wogenstahl wrapped Amber's *body* in a sheet or towel. The night she was abducted, in late November, the weather was cold and windy, with temperatures possibly below freezing.  When her body was found, Amber was wearing a lightweight dress and no coat.  Wheeler's ambiguous testimony about "some kind of wrapping that he wrapped her in at one time" may have referred to a sheet that Wogenstahl used to keep her warm when he first kidnapped her, which could have come from Amber's home.  And the state's theory that Wogenstahl stabbed Amber multiple times in his apartment, wrapped her body in a sheet, and

_____

[4] Wheeler's testimony that Wogenstahl used a stolen key to enter the Garretts' apartment is at odds with the state's theory that the intruder picked the lock.

carried her to his car is difficult to reconcile with the testimony of the UDF employee, who saw a girl sitting upright in the car and stretching.

{¶ 40} The state has also pointed to the blood drop on a door handle inside Wogenstahl's car as a basis for Ohio to assert jurisdiction. But even assuming that the blood came from Amber,[5] Wogenstahl's car could have been in either jurisdiction when the blood was deposited on the handle.

{¶ 41} Moreover, the timeline established by the evidence further erodes the state's theory that Wogenstahl took Amber back to his apartment after abducting her. Even viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could not have concluded that Amber was killed in Wogenstahl's apartment.

*Evidence that Wogenstahl asserts proves*

*that the murder occurred in Indiana*

{¶ 42} Wogenstahl contends that the evidence proves that the murder occurred in Indiana. His argument is founded almost entirely upon the UDF employee's testimony that she saw Amber alive at 3:15 a.m. in a car headed out of state. Because the state line bisects State Street, the vehicle was actually in Indiana at the moment the UDF employee, standing in Ohio, saw it pass. And as Wogenstahl correctly points out, at no point south of the UDF does the Indiana side of State Street veer back into Ohio before becoming Jamison Road, which is entirely in Indiana. Therefore, according to Wogenstahl, since Amber was alive at 3:15 a.m., her murder must have occurred in Indiana.

---

[5] The evidence at trial did not establish that the spot of blood, about 1/25 the size of a dime, came from Amber. A forensic serologist testified that the white-blood-cell allotypes in the sample were consistent with Amber's blood and appear in about 5 percent (1 in 19) of the Caucasian population. He testified, "I can say that [the blood] is similar to hers, but I cannot say whether it is hers or not." In fact, he could not even testify that the bloodstain was recent, conceding that it may have been as much as ten years old.

**{¶ 43}** There are two problems with Wogenstahl's argument. First, although the Indiana side of State Street itself does not enter Ohio, there are side streets that intersect State Street that do lead into Ohio, and Wogenstahl could have turned down one of them before returning to Indiana. Second, and more importantly, R.C. 2901.11(B) would allow Ohio to assert jurisdiction if the victim's death occurred in Ohio *or* if the fatal act occurred in Ohio, even if death ultimately occurred in another jurisdiction. The UDF employee's testimony may establish that Amber was *alive* at 3:15, but it does not show that she was *unharmed*. The fatal injuries may have been inflicted earlier. Therefore, Wogenstahl has not shown that Ohio does not have jurisdiction.

**{¶ 44}** Wogenstahl also asserts that we found in our earlier opinion in this case that the murder occurred in Indiana. In support of this assertion, he quotes the following language from that opinion:

> Appellant physically restrained Amber and bound her arms in the clothing she was wearing. A knife was held to Amber's neck. She was transported in appellant's vehicle across the Ohio-Indiana border.

75 Ohio St.3d at 367, 662 N.E.2d 311. In isolation, this sentence could be read to suggest that Amber was alive when the pair crossed the state line. But the *very next sentence* in the opinion reads,

> *At some point*, appellant killed Amber when he realized that he could not return her to the apartment without being identified as the perpetrator of the aggravated burglary and/or kidnapping offenses.

(Emphasis added). *Id.* Plainly, we took no position as to when in the sequence of events the murder occurred.

{¶ 45} Finally, Wogenstahl asserts that at trial, the state alleged that the murder had occurred in Indiana. In closing argument, the prosecutor described Amber dying under the juniper tree where she was found. However, as the trial judge instructed the jurors, closing arguments are not evidence. *State v. Maurer*, 15 Ohio St.3d 239, 269, 473 N.E2d 768 (1984). Moreover, as discussed above, Ohio can claim jurisdiction if the fatal blow was struck in Ohio, even if she survived long enough to die in Indiana.

{¶ 46} The evidence does not establish that the murder occurred in Indiana.

{¶ 47} We find that it cannot be determined whether Amber was murdered in Ohio or Indiana. Therefore, under R.C. 2901.11(D), the offense is conclusively presumed to have taken place in Ohio. Accordingly, we hold that Ohio had jurisdiction over the aggravated-murder charge.

Judgment affirmed.

O'DONNELL, FRENCH, CARR, and GALLAGHER, JJ., concur.

FRENCH, J., concurs, with an opinion.

O'CONNOR, C.J., dissents, with an opinion joined by O'NEILL, J.

DONNA J. CARR, J., of the Ninth District Court of Appeals, sitting for Fischer, J.

EILEEN T. GALLAGHER, J., of the Eighth District Court of Appeals, sitting for DeWine, J.

_____

**FRENCH, J., concurring.**

{¶ 48} I agree with the majority's conclusion that the location of Amber Garrett's murder cannot be determined and that jurisdiction is therefore proper in Ohio under R.C. 2901.11(D). I write separately because I believe that there is a reasonable question as to the constitutionality of that statute and that this court

should have invited the parties to brief the issue before determining whether to uphold Wogenstahl's capital conviction.

{¶ 49} The version of R.C. 2901.11(D) in effect at the time of the murder, which is substantially similar to the current version, provided:

> When an offense is committed under the laws of this state, and it appears beyond a reasonable doubt that the offense or any element thereof took place either in Ohio or in another jurisdiction or jurisdictions, but it cannot reasonably be determined in which it took place, such offense or element is conclusively presumed to have taken place in this state for purposes of this section.

Am.Sub.H.B. No. 511, 134 Ohio Laws, Part II, 1866, 1893. Applying the statute to the facts of this case, since the state proved that a murder occurred but was unable to prove whether it occurred in Ohio or Indiana, the trial court and the jury had to conclusively presume that it occurred in Ohio for purposes of determining jurisdiction.

{¶ 50} There is at least a colorable argument that the conclusive presumption of jurisdiction in R.C. 2901.11(D) violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. A conclusive presumption is one type of mandatory presumption, the other type being a rebuttable presumption:

> A conclusive presumption removes the presumed element from the case once the State has proved the predicate facts giving rise to the presumption. A rebuttable presumption does not remove the presumed element from the case but nevertheless requires the jury

> to find the presumed element unless the defendant persuades the jury that such a finding is unwarranted.

*Francis v. Franklin*, 471 U.S. 307, 314, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), fn. 2. A mandatory presumption violates the Due Process Clause if it relieves the state of the burden of persuasion as to an element of an offense, either by creating an irrebuttable presumption or by shifting the burden of proof to the criminal defendant. *Id*. at 325; *Sandstrom v. Montana*, 442 U.S. 510, 523-524, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

{¶ 51} By its plain terms, R.C. 2901.11(D) creates a mandatory presumption of jurisdiction: the jurisdiction of the Ohio courts is "conclusively" presumed. It appears, then, that R.C. 2901.11(D) violates the rule of *Francis* and *Sandstrom if* jurisdiction is an element of the offense that the state bears the burden of proving. This court has not directly addressed that question. I note, however, that this court has held that *venue* is an element of the crime that the state must prove beyond a reasonable doubt. *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 1-2, 22.

{¶ 52} The foregoing should not be read to suggest any final conclusion as to the constitutionality of the statute, only that the issue is worthy of consideration. And because counsel for the defendant failed to raise the issue, I believe that the court should have asked the parties to brief the constitutionality of R.C. 2901.11(D). A challenge to subject-matter jurisdiction cannot be waived or forfeited and may be raised at any time, *State v. Mbodji*, 129 Ohio St.3d 325, 2011-Ohio-2880, 951 N.E.2d 1025, ¶ 10, even by this court sua sponte, *State v. Noling*, 136 Ohio St.3d 163, 2013-Ohio-1764, 992 N.E.2d 1095, ¶ 10.

{¶ 53} But presuming the constitutionality of the statute, I agree with the majority's disposition of Wogenstahl's appeal.

———————————

**O'CONNOR, C.J., dissenting.**

{¶ 54} The jurisdictional error in this case bears a remarkable resemblance to the one we unanimously corrected in *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845. Here, as in *Yarbrough*, our duty compels an outcome that is regrettable because of the grief it would cause the family and friends of the victim. But it is an outcome that is necessary to preserve the integrity of the criminal-justice system in Ohio. As we stated in *Yarbrough*, one expects diligence by those participating in the prosecution of a defendant subject to the ultimate penalty of death; failing to ensure that this state has jurisdiction in such a case is a tremendous error and is a disservice to the citizens of Ohio and the victims of violent crime. *Id.* at ¶ 4. We cannot ignore our duty to correct such an error.

{¶ 55} The majority correctly finds that the evidence does not support the state's theory that Amber Garrett was killed in appellant Jeffrey Wogenstahl's apartment in Ohio. But I disagree with the majority's conclusion that there is proof beyond a reasonable doubt that the murder could have occurred in Ohio. Based on the chronology of events established by the testimony of the state's own witnesses, it can reasonably be determined that Amber was murdered in Indiana. Thus, the statutory presumption in R.C. 2901.11(D) permitting Ohio to exercise jurisdiction over Wogenstahl's aggravated-murder charge does not apply. Accordingly, I respectfully dissent.

{¶ 56} The majority holds that "a rational trier of fact could not have concluded that Amber was killed in Wogenstahl's apartment," which is in Ohio, in part because "the timeline established by the evidence * * * erodes the state's theory." Majority opinion at ¶ 41. That same timeline makes it impossible for a rational trier of fact to conclude that she was killed *anywhere* in Ohio.

{¶ 57} The state's witnesses established a clear and consistent timeline. Eric, Amber's sibling who was babysitting Amber on the night she disappeared,

testified that Wogenstahl arrived at their apartment around 3:00 a.m. Eric's estimate of Wogenstahl's arrival time is consistent with the testimony of Amber's mother, Peggy Garrett, who stated that she was with Wogenstahl at the Flicker Inn from approximately 2:20 a.m. until she left for Waffle House, which she reached around 3:00 or 3:15 a.m. Taken together, the testimony of Eric and Garrett establish that the events that led to Amber's murder began, at the *earliest*, around 3:00 a.m.

{¶ 58} According to Eric's testimony, Wogenstahl spent "five or ten minutes" in the Garretts' home before departing with Eric on the pretextual trip to Troy Beard's apartment. Here again, Eric's testimony sets the time parameters: it was 3:10 a.m. when Wogenstahl dropped him off a block away from Beard's apartment and "close to 3:30" by the time Eric walked back home to find the door unlocked and Amber gone. Thus, the testimony established that Amber was abducted no earlier than 3:10 a.m. and no later than 3:30 a.m.

{¶ 59} The UDF employee's testimony was consistent with and further narrowed this timeline. She testified that she saw Wogenstahl and a young female passenger drive past the UDF, heading south on the Indiana side of State Street at 3:15 a.m. The critical detail in the employee's testimony is that the passenger, who must have been Amber, was alive at the moment the car passed the UDF.

> I seen what looked like they were getting up and stretching and then laying back on the car door asleep.
>
> * * *
>
> * * * All I could tell from the silhouette [of the passenger] was that when the person moved that there was a little bit of hair that moved forward and then it was brushed back a little bit and they laid back down.

**{¶ 60}** This fact merits emphasis: the UDF employee saw Wogenstahl's vehicle traveling south on State Street (i.e., moving from right to left past the employee standing in front of the UDF store and facing State Street). The state line runs down the middle of State Street. So when the UDF employee saw Amber alive at 3:15 a.m., Wogenstahl and his victim had *already* crossed over into Indiana.

**{¶ 61}** As the majority concedes, the west side of State Street, the southbound lane, does not reenter Ohio. Majority opinion at ¶ 42. Instead, State Street becomes Jamison Road, which runs southwest entirely in Indiana.

**{¶ 62}** Twenty-five minutes after Wogenstahl passed the UDF store, multiple witnesses saw him and/or his parked car along the side of Jamison Road in Indiana, at a spot roughly four miles from Harrison. Three of the witnesses were drivers of passing cars, and they each testified that Wogenstahl's car was at the Jamison Road location in Indiana at approximately 3:40 a.m. Amber's body was discovered in the vicinity where the witnesses saw Wogenstahl's car stopped on the side of Jamison Road.

**{¶ 63}** Amber died from multiple stab wounds and from blunt trauma to her head; either would have been fatal. One passing motorist testified that he saw Wogenstahl's car with its trunk open by the side of Jamison Road in Indiana at approximately 3:40 a.m. And as he passed the car, the witness saw a man who "looked like [he] was getting something out of the trunk maybe." Police later found an automobile jack in the trunk of Wogenstahl's car that was missing its handle. And the deputy coroner testified that the blunt-trauma injuries to Amber's head were consistent with having been caused by a jack handle. Taken together, the testimony of the motorist and the coroner strongly support the conclusion that the assault that caused these injuries occurred by the side of Jamison Road in Indiana. By "around 3:45 or 4 o'clock," according to the UDF employee, Wogenstahl was back in Harrison, where the UDF employee saw him at the self-serve car wash.

**{¶ 64}** Thus, the evidence reasonably suggests that Amber was alive when she was taken from Ohio, that she was seen alive in Wogenstahl's vehicle in Indiana, that the vehicle in which she was traveling did not return to Ohio with her in it, that she was assaulted in Indiana, and that she died in Indiana.

**{¶ 65}** Rather than draw the obvious conclusion from the evidence, the majority holds that Ohio had jurisdiction based on the supposition that "[t]he fatal injuries may have been inflicted earlier" than 3:15 a.m., when Amber was seen alive in Wogenstahl's car in Indiana. Majority opinion at ¶ 43. But the evidence does not support this conjecture, and in fact, the evidence presented at trial does not allow for this possibility.

**{¶ 66}** If Wogenstahl inflicted the fatal injuries in Ohio earlier than 3:15 a.m., then he took only *five minutes* to drive from where he dropped Eric off near Beard's apartment (which he did at 3:10 a.m.) to the Garretts' home, break in, abduct Amber, inflict the fatal injuries, then drive with Amber on the Indiana side of State Street (where he was seen driving past with Amber at 3:15 a.m.).

**{¶ 67}** But there is no *evidence* that this hypothetical scenario occurred. Investigators found no blood in Amber's home, and the blood found in Wogenstahl's apartment did not indicate Amber as the source.[6] The UDF employee did not testify that the girl in the car was bloody or appeared to be in distress. And the only blood evidence found in the car—a spot measuring 1/25 the size of a dime on the rear, driver-side interior door handle—was inconclusive and may have been as much as ten years old.

---

[6] Although the majority does not adopt the theory, the state suggests that the blood evidence is relevant to permit a finding of jurisdiction in Ohio under R.C. 2901.11(B), which provides that a victim's death is presumed to have occurred in Ohio if any part of the victim's body is found in the state. But the blood was not conclusively linked to Amber. And the suggestion that blood would be considered "any part of the body" under the statute is a novel theory that would be inappropriately adopted here given the absence of any link between the blood and the victim.

**{¶ 68}** In the alternative, the majority adopts the state's suggestion that after passing the UDF at 3:15 a.m., Wogenstahl may have diverted back into Ohio before the motorists saw him on Jamison Road in Indiana at 3:40 a.m. The majority states, "[T]here are side streets that intersect State Street that do lead into Ohio, and Wogenstahl *could have* turned down one of them before returning to Indiana." (Emphasis added.) Majority opinion at ¶ 43. The state nominates Sunset Avenue and Whitewater Drive as possible routes back into Ohio. What is the basis for this conjecture?

**{¶ 69}** The UDF is on the corner of State and Sunset.[7] The UDF employee testified that when she saw Wogenstahl's car at 3:15 a.m., it "was going too fast" to turn into the UDF and it "kept on going by." This testimony precludes any possibility that Wogenstahl turned onto Sunset Avenue. And the prosecution's timeline makes it a virtual impossibility that Wogenstahl had time for a side trip by turning east on Whitewater Drive.

**{¶ 70}** Thus, although there is evidence that the fatal injuries and the death both occurred in Indiana, there is *no* evidence that either the injuries or the death occurred in Ohio. Nonetheless, the majority asserts that either scenario is equally likely so it cannot reasonably be determined in which state the murder took place. I disagree. Conjecture cannot establish beyond a reasonable doubt that the offense could have taken place in Ohio.

**{¶ 71}** Based on the record, it is not reasonably ambiguous where the fatal injuries or death occurred. The evidence points to Indiana. As a result, the state of Ohio had no jurisdiction pursuant to R.C. 2901.11 over Wogenstahl's murder charge. Thus, his aggravated-murder conviction is void and should be vacated. Wogenstahl's remaining convictions for kidnapping and aggravated burglary,

---

[7] https://www.google.com/maps/@39.2552694,-84.8191324,19.55z.

crimes that the state did demonstrate occurred in Ohio, would not be disturbed by this holding.

{¶ 72} Because Wogenstahl's Ohio conviction for aggravated murder is void for lack of jurisdiction, double jeopardy would not bar his retrial in Indiana. *See, e.g., In re S.J.*, 106 Ohio St.3d 11, 2005-Ohio-3215, 829 N.E.2d 1207, ¶ 14 (noting that a claim of former jeopardy cannot be based on a void judgment); *Montana v. Hall*, 481 U.S. 400, 402, 107 S.Ct. 1825, 95 L.Ed.2d 354 (1987) ("It is a 'venerable principl[e] of double jeopardy jurisprudence' that 'the successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence to support the verdict, * * * poses no bar to further prosecution on the same charge' " [brackets sic]), quoting *United States v. Scott*, 437 U.S. 82, 90-91, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978). And any purported uncertainty as to the location of the murder will not benefit Wogenstahl a second time. Under current Indiana law, "[i]f the body of a homicide victim is found in Indiana, it is presumed that the result occurred in Indiana."[8] Ind.Code 35-41-1-1(c). This jurisdictional provision has been substantively unchanged since it was enacted in 1976. *See* Ind. Acts 1976, Pub.Law No. 148-1976, section 1. Therefore, it appears that Wogenstahl will not be able to escape the jurisdiction of the Indiana courts.[9]

{¶ 73} As we recognized in *Yarbrough*, "[t]he General Assembly has not authorized an Ohio court of common pleas to exercise jurisdiction over the prosecution of a defendant for the crime of aggravated murder when, as here, the killing occurred in another state." *Id.* at ¶ 1. Pursuant to the version of R.C. 2901.11 in effect at the time of this crime, the state of Ohio had no jurisdiction to try

---

[8] The Indiana statute makes clear that, in homicide cases, "result" refers to "either the death of the victim or the bodily impact causing death." Ind.Code 35-41-1-1(c).

[9] I note that Indiana law permits imposition of the death penalty in cases of felony murder predicated on kidnapping, Ind.Code 35-50-2-9(b)(1)(E), as well as for the murder of a person under the age of 12, Ind.Code 35-50-2-9(b)(12). The same provisions were in effect in November 1991, at the time of the crime. *See* Ind. Acts 1990, Pub.Law No. 1-1990, section 354.

Wogenstahl for murder. His aggravated-murder conviction is void and should be vacated, and Wogenstahl should be tried in Indiana for the murder.

{¶ 74} For these reasons, I dissent.

O'NEILL, J., concurs in the foregoing opinion.

_____

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Philip R. Cummings and Sean M. Donovan, Assistant Prosecuting Attorneys, for appellee.

Timothy Young, Ohio Public Defender, and Kimberly Rigby and Elizabeth Arrick, Assistant Public Defenders, for appellant.

_____